UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
                                     \*
Travel Sentry, Inc.                  \*
                   Plaintiff         \*
                                     \*
                                     \*
v.                                   \*
                                     \*   Civil Docket No. 06-cv-118
                                     \*
David Tropp                          \*
                   Defendant         \*
                                     \*
and                                  \*
Safe Skies, LLC                      \*
                   Defendant         \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK COUNTY

### AFFIDAVIT OF HEIDSHA SHELDON

I, Heidsha Sheldon, under oath, hereby state as follows:

1.      I am an associate at the law firm of Seyfarth Shaw LLP, resident in its Boston

office, located at Two Seaport Lane, Suite 300, Boston, Massachusetts 02210, and counsel to the

plaintiff, Travel Sentry, Inc ("Travel Sentry").  I submit this affidavit of my own personal

knowledge in support of Travel Sentry's Opposition to Safe Skies, LLC's Motion to Dismiss for

Lack of Subject Matter Jurisdiction.

2.      Attached hereto as Exhibit 1 is a true and accurate copy of the relevant excerpts of

the deposition of defendant David A. Tropp ("Tropp") taken in Travel Sentry, Inc. v. David A.

Tropp and Safe Skies, LLC, Eastern District of New York, Civil Action No. 05-CV-2338 (the

"New York Action").

3.      Attached hereto as Exhibit 2 is a true and accurate copy of the October 12, 2006

Affidavit of Tropp, which was filed by Tropp in the New York Action.

Signed under the pains and penalties of perjury this 6th day of November, 2006.

_____
Heidsha Sheldon

**EXHIBIT 1**

# In The Matter Of:

*TRAVEL SENTRY, INC.,    v.*
*DAVID A. TROPP, et al.,*

---

*DAVID A. TROPP*
*October 18, 2005*

---

*ELISA DREIER REPORTING CORP.*
*780 THIRD AVENUE*
*NEW YORK, NY  USA  10017*
*(212) 557-5558*

*Original File 1018TRAV.TXT, 232 Pages*
*Min-U-Script® File ID: 1028555266*

# Word Index included with this Min-U-Script®

**Page 62**

**David A. Tropp**

[1]
[2] writing?
[3] **A:** What was done in writing?
[4] **Q:** The opportunity that was
[5] offered to you in writing by TSA?
[6] **A:** Did they offer that in writing
[7] is your question?
[8] **Q:** Yes.
[9] **A:** In a letter from Francine
[10] Kerner, I don't remember the exact text that she
[11] used, but it's in the discoverable documents.
[12] That's when TSA acknowledged that we could
[13] compete and they would recognize us.
[14] **Q:** Did you ever get anything more
[15] formal from TSA about authorizing you to produce
[16] this product?
[17] **A:** I don't recall.
[18] **Q:** No contract or memorandum of —
[19] **A:** Sure.
[20] **Q:** You do have a contract with
[21] them?
[22] **A:** We signed an agreement with
[23] TSA.
[24] **MR. BROOKS:** It's never been
[25] produced in this case.

**Page 63**

**David A. Tropp**

[1]
[2] **MR. DIAMANTE:** Do you have
[3] the document?
[4] **THE WITNESS:** Not with me.
[5] **Q:** Is it a memorandum of
[6] understanding?
[7] **A:** I believe that's what the title
[8] is.
[9] **Q:** Is it in a similar format and
[10] structure to the Travel Sentry memorandum of
[11] understanding?
[12] **A:** I believe so, yes.
[13] **Q:** Do you know when that was
[14] dated?
[15] **A:** Which signature?
[16] **Q:** Either signature.
[17] **A:** I don't recall.
[18] **Q:** What year?
[19] **A:** 2004.
[20] **Q:** What month?
[21] **A:** I don't recall.
[22] **Q:** Do you recall the season?
[23] **A:** It was early 2004.
[24] **Q:** And then you had a prototype
[25] produced after that?

**Page 64**

**David A. Tropp**

[1]
[2] **A:** After the signing of the
[3] agreement with TSA?
[4] **Q:** Yeah, was the prototype
[5] produced after you signed an agreement with TSA?
[6] **A:** I don't believe so.
[7] **Q:** Before that time?
[8] **A:** I believe it was — the
[9] prototype was produced after we had commitment
[10] from TSA that they would work with us.
[11] **Q:** And before the memorandum of
[12] understanding was signed?
[13] **A:** It's tough to say, but I
[14] believe so.
[15] **Q:** Who produced the first
[16] prototype?
[17] **A:** You're asking for —
[18] **Q:** A company or individual.
[19] **A:** It was a factory in India.
[20] **Q:** India?
[21] **A:** Yes, sir.
[22] **Q:** Who was responsible for
[23] contracting with the factory in India for the
[24] production of that prototype?
[25] **A:** My business partner.

**Page 65**

**David A. Tropp**

[1]
[2] **Q:** That's Mr. Smaldone?
[3] **A:** Yes, sir.
[4] **Q:** Are there any documents
[5] reflecting your contract with the factory in
[6] India to produce the prototype?
[7] **A:** I'm not sure.
[8] **Q:** Do you know whether there is
[9] letters or e-mails or contracts, purchase
[10] orders, anything of that sort?
[11] **A:** I'm not sure.
[12] **Q:** Did you get a written response
[13] to Exhibit 2?
[14] **A:** Yes, sir.
[15] **Q:** Do you recall when that was?
[16] **A:** The letter from TSA was dated
[17] February 2003.
[18] **Q:** When did you send Exhibit 2 to
[19] the TSA?
[20] **A:** The exact date is on that
[21] document right there. (Indicating.)
[22] **MR. BROOKS:** I'm going to
[23] have marked as Exhibit 2A four pages
[24] of documents, 2A, please.
[25]      (Assorted documents marked

# In The Matter Of:

*TRAVEL SENTRY, INC.,    v.*
*DAVID A. TROPP, et al.,*

---

*DAVID A. TROPP*
*October 19, 2005*

---

*ELISA DREIER REPORTING CORP.*
*780 THIRD AVENUE*
*NEW YORK, NY  USA  10017*
*(212) 557-5558*

*Original File 1019TRAV.TXT, 103 Pages*
*Min-U-Script® File ID: 2089910218*

# Word Index included with this Min-U-Script®

Page 258

**David A. Tropp**

[1]
[2]  **A:** I don't believe so.
[3]  **Q:** Did you follow-up with
[4]  Mr. Mitchell?
[5]  **A:** I don't believe so.
[6]  **MR. BROOKS:** My next exhibit,
[7]  please.
[8]  (Letter dated December 3,
[9]  2003 marked Plaintiff's Exhibit 20
[10] for identification.)
[11] **Q:** This is a copy of a letter that
[12] you sent to LL Bean on or about December 3rd of
[13] 2003.
[14] **A:** I see that, but it doesn't
[15] appear that I actually signed the letter.
[16] **Q:** Do you know if you did send it
[17] to them?
[18] **A:** No, that I actually signed the
[19] letter is what I said.
[20] **Q:** Did you send it to them?
[21] **A:** I believe so.
[22] **Q:** Under the letterhead The
[23] Liberty Lock?
[24] **A:** It appears so.
[25] **Q:** Why did you send this letter to

Page 259

**David A. Tropp**

[1]
[2]  LL Bean?
[3]  **A:** I wanted an opportunity to tell
[4]  them my story.
[5]  **Q:** Why is that?
[6]  **A:** I'm sorry?
[7]  **Q:** Why?
[8]  **A:** I'm not sure.
[9]  **Q:** Was the story you wanted to
[10] tell LL Bean your claim that your concept was
[11] misappropriated by Travel Sentry and
[12] Mr. Vermilye?
[13] **A:** I believe it's more that I
[14] wanted to meet with them face to face to let
[15] them know that my intellectual property was
[16] misappropriated.
[17] **Q:** And you suggest in your letter,
[18] actually state in your letter that you would be
[19] taking patent infringement action against those
[20] who were using the Travel Sentry program;
[21] correct?
[22] **A:** I don't see that, sir.
[23] **Q:** You say "When my patent is
[24] issued, as my attorney and I expect it to, the
[25] entities involved in this project will be

Page 260

**David A. Tropp**

[1]
[2]  involved in patent infringement." Weren't you
[3]  suggesting if LL Bean carried the Travel Sentry
[4]  lock, it would be involved with patent
[5]  infringement?
[6]  **A:** I think I was offering them an
[7]  opportunity to discuss my situation face to
[8]  face.
[9]  **Q:** "For LL Bean it would make most
[10] sense to deal directly with me if there is
[11] interest in pursuing this since I will have to
[12] litigate against potential infringers of my
[13] intellectual property." That's what you wrote.
[14] Correct?
[15] **A:** Can you repeat the question?
[16] **Q:** I just read the sentence. I
[17] just asked you if I read it accurately. The
[18] sentence that begins "For LL Bean it would make
[19] most sense to deal directly with me if there is
[20] interest in pursuing this since I will have to
[21] litigate against potential infringers of my
[22] intellectual property."
[23] **A:** It appears that's what it says.
[24] **Q:** You were suggesting LL Bean
[25] would be wise to deal with you and not Travel

Page 261

**David A. Tropp**

[1]
[2]  Sentry because they would be getting involved in
[3]  patent infringement?
[4]  **MR. DIAMANTE:** Do you
[5]  understand what he meant by that?
[6]  **A:** I wanted the opportunity to sit
[7]  down with them face to face to explain my
[8]  situation. And I'm a small individual, I'm one
[9]  person, so I — I knew that this letter wouldn't
[10] change anything and I wanted the opportunity to
[11] sit down with them face to face.
[12] **Q:** Was LL Bean a licensee of
[13] Travel Sentry in December of 2003, to your
[14] knowledge?
[15] **A:** I don't believe that they are a
[16] licensee of —
[17] **Q:** Do you know if they were a
[18] prospective customer of Travel Sentry or its
[19] products in December of 2003?
[20] **MR. DIAMANTE:** Did you know
[21] that back then?
[22] **THE WITNESS:** I don't believe
[23] so.
[24] **Q:** You would agree with me that
[25] what you were stating or suggesting in your

Page 262

**David A. Tropp**

[2] letter was that if LL Bean carried the Travel
[3] Sentry product, it might be subject to a patent
[4] infringement action; correct?
[5]   **A:** Like I said, I was most
[6] concerned with getting them to —
[7]   **Q:** I'm sorry to interrupt you.
[8] You're not answering my question. If you listen
[9] carefully to the question and listen to the
[10] question, we'll all get out of here much
[11] quicker.
[12]   **MR. BROOKS:** Can you read the
[13] question back, please?
[14]   **MR. DIAMANTE:** He's asking
[15] you were you threatening LL Bean in
[16] this letter, was that your intent, is
[17] that what you were trying to do.
[18]   **A:** I was trying to give them an
[19] opportunity to meet with me face-to-face to
[20] explain my situation.
[21]   **MR. BROOKS:** I appreciate
[22] your effort, Joe, but now if we could
[23] have my question read back.
[24]   (The last question was read
[25] back by the court reporter.)

Page 263

**David A. Tropp**

[2]   **A:** It appears so, sir.
[3]   **Q:** You also advised LL Bean that
[4] the TSA allowed your invention to be disclosed
[5] to Travel Sentry and its founder; correct?
[6]   **A:** That's my belief, sir.
[7]   **Q:** But you don't know that to be
[8] true, do you?
[9]   **A:** Like I said, sir, I had a
[10] written confidentiality agreement with the TSA
[11] and your client worked there at the time and
[12] that's my belief.
[13]   **Q:** But you don't know it to be
[14] true?
[15]   **A:** No, sir.
[16]   **Q:** Did you say in your letter to
[17] LL Bean that I believe this to have happened, or
[18] did you state as a fact that it did not happen?
[19]   **A:** I believe that's the case.
[20]   **Q:** Does it say anywhere in your
[21] letter this is true?
[22]   **A:** I don't see that.
[23]   **Q:** Did you have any follow-up
[24] communications with LL Bean?
[25]   **A:** I believe I tried to offer them

Page 264

**David A. Tropp**

[2] my product and as I understand it, they're
[3] currently selling your client's lock.
[4]   **Q:** After December 3 of 2003 —
[5]   **A:** I believe so.
[6]   **Q:** When?
[7]   **A:** I don't recall.
[8]   **Q:** 2005?
[9]   **A:** I don't recall.
[10]   **Q:** Did you have a product to sell
[11] in 2004?
[12]   **A:** I believe that I contacted them
[13] once I had a product to sell.
[14]   **Q:** When did you first have a
[15] product to sell?
[16]   **A:** I believe in 2004.
[17]   **Q:** When in 2004 did you first have
[18] a product to sell?
[19]   **A:** I believe the second quarter.
[20]   **Q:** When was the first time that
[21] you actually sold one of your locks?
[22]   **A:** What do you mean by "sell"?
[23]   **Q:** What do you mean by "sell"?
[24]   **MR. DIAMANTE:** Are you
[25] confused with having a contract

Page 265

**David A. Tropp**

[2] versus actually selling them
[3] physically?
[4]   **THE WITNESS:** Yes.
[5]   **Q:** When was the first time that
[6] you had a contract for the sale of your lock?
[7]   **A:** I'm not sure of the dates.
[8]   **MR. DIAMANTE:** Approximately?
[9] Was it the second quarter of 2004,
[10] third quarter of 2004?
[11]   **THE WITNESS:** I believe it
[12] was in 2005.
[13]   **Q:** Do you know when in 2005?
[14]   **A:** Not off the top of my head,
[15] sir.
[16]   **Q:** Do you know when the first of
[17] your locks was available for purchase at retail
[18] in the United States?
[19]   **A:** I'm not sure, sir.
[20]   **Q:** 2005, though?
[21]   **A:** I believe so.
[22]   **Q:** No further communications to or
[23] from LL Bean after your letter of December 3,
[24] 2003 until that time when you had a product to
[25] sell; is that correct?

Page 298

**David A. Tropp**

[1]
[2] concept had been stolen by Travel Sentry, didn't
[3] you?
[4]    A: I'd have to look at the dates.
[5]    Q: Can you tell me without looking
[6] at a piece of paper whether or not you remember
[7] today that after January of 2004, you continued
[8] to tell people that your intellectual property
[9] had been stolen?
[10]    A: It's possible that I did.
[11]    Q: Even though Mr. Bernstein was
[12] looking to resolve the issue?
[13]    MR. DIAMANTE: Objection to
[14] the form. I don't see the
[15] connection, but you can answer it.
[16] Do you have something to show him?
[17]    MR. BROOKS: I'm asking for
[18] his memory. I'm entitled to his
[19] memory.
[20]    Q: You wrote to Jet Blue in 2004,
[21] didn't you, after Mr. Bernstein's letter?
[22]    A: It's possible.
[23]    Q: Did you suggest or state to Jet
[24] Blue your intellectual property had been
[25] misappropriated?

Page 299

**David A. Tropp**

[1]
[2]    A: I believe they received a
[3] similar letter that LL Bean and the other ones
[4] received.
[5]    Q: Why did you write to Jet Blue?
[6]    A: My intention was to tell them
[7] my situation, to tell people my story.
[8]    Q: Was Jet Blue a prospective
[9] buyer of your locks?
[10]    MR. DIAMANTE: At any time
[11] did you consider them to be a
[12] prospective buyer of your locks?
[13]    THE WITNESS: Yes.
[14]    Q: Would you consider them to be a
[15] prospective buyer of the Travel Sentry locks?
[16]    A: I don't know if your client
[17] identified them as, you know, a business
[18] opportunity.
[19]    Q: I didn't ask you that, I asked
[20] you whether or not you considered Jet Blue to be
[21] a prospective buyer of Travel Sentry locks?
[22]    MR. DIAMANTE: At the time he
[23] sent the letter?
[24]    MR. BROOKS: Yes.
[25]    MR. DIAMANTE: Did you?

Page 300

**David A. Tropp**

[1]
[2]    THE WITNESS: No.
[3]    Q: So you thought there might be a
[4] customer of yours, but not a customer of Travel
[5] Sentry's?
[6]    A: I believe I was capable of
[7] getting them as a customer.
[8]    Q: But you didn't think Travel
[9] Sentry was?
[10]    A: Like I said, I can speak for
[11] myself, I believe I was capable of getting them
[12] as a customer.
[13]    Q: Did you see them as being a
[14] prospective customer of Travel Sentry?
[15]    A: I answered no.
[16]    MR. BROOKS: Mark that as my
[17] next exhibit, please.
[18]    (Letter dated February 1,
[19] 2004 marked Plaintiff's Exhibit 28
[20] for identification.)
[21]    Q: I placed in front of you, sir,
[22] a letter of February 1, 2004. It's a letter you
[23] sent to Jet Blue, yes?
[24]    A: Yes, sir.
[25]    Q: In this letter you again state

Page 301

**David A. Tropp**

[1]
[2] that the TSA allowed your invention to be
[3] disclosed to Travel Sentry and its founder?
[4]    A: That was my belief, sir.
[5]    Q: And then you go on to state
[6] when your patent is issued, those involved in
[7] the project will be involved in patent
[8] infringement; is that true?
[9]    A: I said that.
[10]    Q: You then state it would make
[11] most sense for Jet Blue to deal with you because
[12] you are going to have to litigate against
[13] potential infringers of your intellectual
[14] property; correct?
[15]    A: That I see.
[16]    Q: You are suggesting if they
[17] dealt with Travel Sentry, they would be subject
[18] to a patent infringement action?
[19]    A: I suggested that I would have
[20] to litigate against potential infringers.
[21]    Q: You are suggesting that Jet
[22] Blue would be a potential infringer?
[23]    A: I was suggesting I meet with
[24] them face to face in order to tell them my
[25] situation, tell my story.

---

Page 302

*David A. Tropp*

[1]
[2]  **Q:** Was there something wrong with
[3]  my question that you don't want to answer my
[4]  question?
[5]  **MR. BROOKS:** Could you read
[6]  my question back?
[7]  **A:** I don't believe that I was
[8]  suggesting that.
[9]  **Q:** What you wrote was for Jet Blue
[10] it would make most sense to deal directly with
[11] me if there is interest in pursuing this, since
[12] I will have to litigate against potential
[13] infringers of my intellectual property?
[14] **A:** I was asserting that — I was
[15] saying I would assert my intellectual property
[16] rights.
[17] **Q:** Do you agree that that could be
[18] understood by somebody reading it as a
[19] suggestion that if they used the Travel Sentry
[20] program, they are going to be sued for
[21] infringement?
[22] **A:** Like I said, I wasn't concerned
[23] with the Travel Sentry program. I said if there
[24] is interest in pursuing this, meaning my offered
[25] property, nothing to do with your client.

---

Page 303

*David A. Tropp*

[1]
[2]  **MR. BROOKS:** Would you read
[3]  my question back, please? If you
[4]  listen carefully to my question, we
[5]  will accommodate your lawyer to get
[6]  out of here as soon as we can.
[7]  **MR. DIAMANTE:** If you
[8]  understand his question.
[9]  **MR. BROOKS:** Can we have it
[10] read back, please.
[11]    (The last question was read
[12] back by the court reporter.)
[13] **A:** It's possible somebody could
[14] understand it that way.
[15] **Q:** That would be a reasonable
[16] interpretation of your letter, wouldn't it?
[17] **A:** I said it's possible somebody
[18] can interpret it that way.
[19] **Q:** Now I'm asking you a different
[20] question. Would you agree that would be a
[21] reasonable interpretation of your letter?
[22] **A:** Sure.
[23] **Q:** After Mr. Bernstein asked for
[24] your evidence in January, you continued to
[25] communicate with other people about your claim

---

Page 304

*David A. Tropp*

[1]
[2]  that Travel Sentry had misappropriated your
[3]  intellectual property, didn't you?
[4]  **A:** I don't recall.
[5]  **Q:** You don't recall anybody else?
[6]  **A:** No, sir.
[7]  **Q:** Do you know a Richard Krulik,
[8]  K-R-U-L-I-K?
[9]  **A:** Yes, sir.
[10] **Q:** Who is Mr. Krulik?
[11] **A:** I believe he's an officer with
[12] Briggs & Reilly Luggage.
[13] **Q:** A luggage company?
[14] **A:** One of your client's customers.
[15] **Q:** Was he a customer in March of
[16] 2004?
[17] **A:** I don't believe so.
[18] **Q:** Did you write to him at his
[19] home?
[20] **A:** It's possible.
[21] **Q:** Why did do you that?
[22] **A:** My intention was to meet with
[23] him face-to-face, to tell him my situation.
[24] That's it.
[25] **Q:** Did you tell him that Travel

---

Page 305

*David A. Tropp*

[1]
[2]  Sentry had stolen your idea?
[3]  **A:** I don't recall.
[4]  **MR. BROOKS:** My next exhibit,
[5]  please.
[6]    (Letter dated March 9, 2004
[7]  marked Plaintiff's Exhibit 29 for
[8]  identification.)
[9]    (An off the record discussion
[10] took place.)
[11]    (A recess was taken.)
[12]    (The last question and
[13] answer were read back by the court
[14] reporter.)
[15]    **CONTINUED EXAMINATION**
[16]    **BY MR. BROOKS:**
[17] **Q:** I've placed in front of you,
[18] sir, Exhibit 29. This is a copy of a letter
[19] that you sent to Mr. Krulik on or about March 9
[20] of 2004; is that right?
[21] **A:** I see that.
[22] **Q:** And it is a letter you sent to
[23] him?
[24] **A:** Yes.
[25] **Q:** Why did you sent this to him?

---

Page 322

**David A. Tropp**

[1]
[2]   A: My business did.
[3]   Q: And Travel Pro was appointed
[4] the exclusive distributor of your lock?
[5]   A: Is that a confidentiality
[6] issue?
[7]   MR. BROOKS: I think that's
[8] in the public domain.
[9]   MR. DIAMANTE: Is that true?
[10]   MR. BROOKS: The claim is
[11] being made publicly, I don't know
[12] whether that's true or not.
[13]   A: Yes, it's true.
[14]   Q: Do you recall when you entered
[15] into that agreement?
[16]   A: Sometime in 2005, I believe.
[17]   Q: Do you remember what season or
[18] what quarter?
[19]   A: I don't recall.
[20]   Q: Are you aware of any claims
[21] that Travel Pro has made about the
[22] misappropriation of your intellectual property
[23] by Travel Sentry?
[24]   A: Aside from what I read in the
[25] litigation? No.

Page 323

**David A. Tropp**

[1]
[2]   Q: Have you discussed with anyone
[3] at Travel Pro whether anybody at Travel Pro has
[4] made claims that your intellectual property was
[5] misappropriated by Travel Sentry?
[6]   A: Is this an attorney issue?
[7]   Q: I'm not asking what you said to
[8] your lawyer, I'm asking —
[9]   A: I didn't.
[10]   Q: Are you aware that Travel Pro
[11] has alleged it is the original TSA anticipated
[12] lock?
[13]   A: That Safe Skies is the
[14] original.
[15]   Q: That Travel Pro has alleged
[16] that Safe Skies is the original TSA accepted
[17] lock?
[18]   A: Based on an advertisement, yes.
[19]   Q: What was the first lock to be
[20] accepted by TSA?
[21]   A: Travel Sentry.
[22]   Q: Not Safe Skies?
[23]   A: Based on a memorandum being
[24] signed with TSA?
[25]   A: Yes.

Page 324

**David A. Tropp**

[1]
[2]   A: Not Safe Skies.
[3]   Q: When is the first time that TSA
[4] had master keys produced or manufactured by Safe
[5] Skies?
[6]   A: Without checking my records, I
[7] can't answer that.
[8]   Q: 2005?
[9]   A: I believe so.
[10]   Q: When you entered into a
[11] memorandum of understanding with TSA, was there
[12] any release or indemnification provided to you
[13] by TSA?
[14]   A: No.
[15]   Q: Did you give TSA any release of
[16] claims that you have against them in
[17] consideration for the memorandum of
[18] understanding?
[19]   A: Not in writing.
[20]   Q: Did you do it orally?
[21]   A: No.
[22]   Q: Did they ask you for one?
[23]   A: No.
[24]   Q: Do you know who Travel Pro has
[25] communicated to about the claim that your

Page 325

**David A. Tropp**

[1]
[2] intellectual property has been misappropriated?
[3]   MR. DIAMANTE: Well, it
[4] assumes facts not in evidence that
[5] this actually occurred. Subject to
[6] the objection, you can answer.
[7]   A: I have no idea.
[8]   Q: From the evidence we have here,
[9] there is about twenty different companies that
[10] you have communicated with claiming that
[11] Mr. Vermilye or Travel Sentry misappropriated
[12] your intellectual property, does that sound
[13] right?
[14]   A: Approximately.
[15]   Q: Brookstone?
[16]   A: I trust your word.
[17]   Q: Did you ever advise any of
[18] those companies that your patent application had
[19] been rejected by the PTO?
[20]   A: I don't recall.
[21]   Q: You told many of those
[22] companies that you were going to get a patent
[23] and that you were then going to bring suit for
[24] patent infringement; correct?
[25]   MR. DIAMANTE: Did you tell

**EXHIBIT 2**

Joseph Diamante (JD8578)
Gianni Servodidio (GS0713)
Richard H. An (RA1492)
Jenner & Block LLP
919 Third Avenue, 37th Fl.
New York, N.Y. 10022
(212) 891-1600

Attorneys for Defendants David A. Tropp and Safe Skies, LLC

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x
                                                                 :
TRAVEL SENTRY, INC.,                                             :
                                                                 :
                                       Plaintiff,                :   Civil Action No.
                                                                 :   05-CV-2338
                            v.                                   :
                                                                 :   Judge Gleeson
DAVID A. TROPP and SAFE SKIES, LLC,                             :   Magistrate Judge Matsumoto
                                                                 :
                                       Defendants                :
                                                                 :
---------------------------------------------------------------- x

I, David Tropp, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1.     I am a defendant in the above-captioned action.  I submit this declaration of my

own personal knowledge in support of Defendants' Opposition to Travel Sentry's Motion for

Contempt.

2.     I am keenly aware of my obligations under the terms of the Permanent Injunction

Order that the Court entered in this case on August 23, 2006 (the "Order").  I agreed to the terms

of the Order as a way to settle this case and to permit me to focus my limited financial resources

on my business and on my defense of the pending declaratory judgment action that Travel Sentry

has filed against me and my company in the District of New Hampshire.

3.      The last thing I would ever set out to do is violate the terms of the Order, intentionally or otherwise.  Since the start of this case in May 2005 (and even more so after the entry of the Order), I have been extremely careful about my public communications and those of my business.  I am trying to establish a successful business, and I have already seen in the early stages of my enterprise that legal issues can quickly complicate the already difficult task of competing in the marketplace.  As a matter of policy and practice, I seek legal review of virtually all print advertisements, product packaging and statements regarding my products and my company.

4.      At no time after the entry of the Order have I stated, or instructed anyone else to state on my behalf, that my locks or the locks of Safe Skies, LLC ("Safe Skies") are the "original TSA accepted or approved lock" or any other statement to that effect.

5.      As described below, I did not authorize or approve the statement that is the subject of Travel Sentry's Motion.  In fact, **I took specific action to stop the use of the language the day after the Order was entered** and long before Travel Sentry filed Motion for Contempt without any advance warning.   Prior to being notified of plaintiff's Motion on Friday, September 29, 2006, I did not know that the language at issue was in use and, if Travel Sentry has brought this to the attention of my counsel, I would have had it removed immediately.

6.      The main ways that Safe Skies advertises and promotes its products are through print advertisements and over its web site www.safeskieslocks.com.  In consultation with an outside marketing firm named Yooter InterActive Marketing Agency ("Yooter"), we decided to also explore some non-traditional kinds of "cult advertising" over the Internet.  Specifically, about two weeks prior to August 24, 2006, I had discussed with Yooter the idea of posting a

2

video about Safe Skies locks on Google Video -- an Internet portal where users can post and view various kinds of personal or commercial videos.

7.     I made the video showing Safe Skies locks and sent it to Yooter so that they could prepare the posting. On August 24, 2006, Yooter advised me that they had posted the video on Google Video and asked me to review the posting. When I reviewed the posting, I saw that Yooter had drafted written text to accompany the video and that, without my knowledge or approval, the text referred to Safe Skies locks as the "first and only TSA Luggage Locks."

8.     In order to avoid any possible question of whether the language was appropriate under the Order, I advised Yooter by email on August 24 that the language needed to be changed immediately. My email to Yooter is attached as Exhibit 1.   To my knowledge, Yooter changed the text on Google Video that same day.

9.     Well before the events that led to this motion, Yooter created pages for me to use on MySpace.com. I currently use the page that is shown in the attached Exhibit 2. I do not use any other MySpace pages. I have reviewed Exhibit B to the declaration of Joel Blumenthal, which is a copy of a page on MySpace that refers to Safe Skies locks and contains text with the phrase "first and only TSA Luggage Locks." The MySpace page shown in the exhibit is a page that was created by Yooter. I do not use this page and did not know that it was active. I did not post the text on the page or instruct anyone else to post the text. I first learned that this text was on the MySpace page on Friday, September 29, 2006, when my attorneys advised me that plaintiff Travel Sentry had filed this motion for contempt.

10.     I contacted Yooter on the day I learned of the contempt motion. . They told me that they made the MySpace posting, but they did not realize that they had posted the old text that I had instructed them to remove. I instructed them to remove the language immediately and

3

to determine whether the language had been used in any other place.   To my knowledge, all postings of this text were removed as of Monday, October 2, 2006.

11.    Prior to the incident at issue, I had instructed Yooter that I must approve all materials or postings that they created on my behalf.  Prior to this incident, to my knowledge, that policy had been followed for all postings that Yooter had made for me.  As I stated above, this video was a new initiative and a different type of posting than those that Yooter had previously handled.  I believe that the Google Video and MySpace posting of the video was an isolated error that will not be repeated.  Nevertheless, I strongly reiterated to Yooter the necessity that all postings or other dissemination of material regarding Safe Skies locks must be approved by me.

12.    Safe Skies LLC is a small company with only two owners/employees, including me.  I am a young entrepreneur, and I devote all of my time and energy to the company. Although I believe strongly in our products, our sales have been relatively modest and our legal expenses have been significant in connection with this case.   In April 2006, Travel Sentry also sued us in New Hampshire for a declaratory judgment on several patents, and we have had to retain New Hampshire counsel as well as our current counsel to defend that action.  I believe that Travel Sentry's filing of the current motion without notice, which seeks monetary sanctions against me based on a single, erroneous MySpace posting, is part of an ongoing effort to inflict economic harm on my small company and to eliminate the competitive threat that we pose.

4

I declare under the penalty of perjury that the foregoing is true and correct as of this 12th

day of October, 2006.

_____
David Tropp

**From:** DTropp@aol.com
**Sent:** Thursday, August 24, 2006 12:28 PM
**To:** president@yooter.com
**Cc:** DTropp@aol.com; jolene.nye@yootercorp.com
**Subject:** Google Videos
Urgently need you guys to change the text on Google videos for our video to below: what's up there now is not good ("first and only TSA Luggage Locks" will definitely create a headache for me - I appreciate the thought though). Please use what I wrote up below, it's OK for legal and SEO purposes:


"When your luggage is secured with TSA Luggage Locks from www.safeskieslocks.com, your trip becomes worry-free. Safe Skies TSA Luggage Locks is the patent holder for the TSA Luggage Lock. The Company stands behind their guarantee that travelers luggage locks will not be damaged or clipped by airport security during inspection. Try Safe Skies TSA Locks for stress free travel. www.safeskieslocks.com "







10/16/2006

www.myspace.com/tsalocks

http://www.myspace.com/tsalocks



